## SAMPSON & MURDOCK CO. v. SEAVER–RADFORD CO.

(Circuit Court, D. Massachusetts. April 22, 1904.)

No. 1,937.

1. PRELIMINARY INJUNCTION—DISCRETION OF COURT—CONSIDERATIONS AFFECTING.

On an application for an injunction pendente lite, the court should consider the effect on both parties of the granting or refusal of the order; and, where it appears that in either case great or irreparable injury will result to one or the other, the court will take the course which seems most conducive to justice to both parties.

2. COPYRIGHT—SUIT FOR INFRINGEMENT—PRELIMINARY INJUNCTION.

On an application for a preliminary injunction to restrain the publication and sale of a city directory alleged to infringe complainant's copyrighted directory, the master to whom the application was referred reported findings that defendant's directory contained infringing matter; that its sale would not interfere to any great extent with the sale of the copyrighted work, which was published some time previously, but that it would result in large loss to complainant in its general business as publisher of an annual directory, the amount of which could not be well determined; also that defendant's directory was printed and bound and ready for sale; that it was different in size and appearance from complainants, and not likely to be mistaken therefor; that defendant had expended a large sum in its preparation, and had a large amount due for advertising matter therein, which was not collectible until the books had been published and sold; and that its sale would be, to a great extent, lost, if delayed for any considerable time. *Held*, that a preliminary injunction would be refused on condition that defendant should give a bond to secure the payment of damages that might be recovered, and should keep an account of its sales.

In Equity. Suit for infringement of copyright. On motion for preliminary injunction.

This is a suit in equity by Sampson & Murdock Company, a corporation organized under the general laws of the state of Rhode Island, a citizen of that state, against Seaver-Radford Company, a corporation organized under the general laws of the commonwealth of Massachusetts, and a citizen of that commonwealth, having its usual place of business at Boston. The complainant is publisher of "The Boston Directory," which contains a city record, a directory of the citizens' business directory, a street directory, and a map for the year commencing July 1, 1903, upon which it has obtained a copyright, as is alleged in the bill. The defendant corporation has prepared and printed, and, without the consent of the complainant, is about to publish and sell, or offer for sale, a book entitled "The 1904 City Directory of Boston." The bill alleges that this book of defendant, the 1904 City Directory of Boston, is an infringement upon the complainant's publication, the Boston Directory; that the defendant's book is a copy, in whole or in part, of the compiled and copyrighted work of the complainant; that the copying and threatening to publish and sell defendant's book is in violation of complainant's rights in its copyrighted work. The cause is now heard upon the complainant's application for an interlocutory injunction. Upon this application the cause was referred by the court to Frederic Dodge, Esq., as master, who has presented a very complete report. Upon this report the action of the court is based. The allegations of the bill in equity referred to in said report are as follows:

"(1) That on or before the 29th day of June, 1903, and prior to the date of the publication thereof in this or any foreign country, the firm of Sampson, Murdock & Co., of Boston, the predecessors in business of your orator, de-

¶ 2. See Copyrights, vol. 11, Cent. Dig. § 78.

posited in the mails within the United States, addressed to the librarian of Congress, at Washington, District of Columbia, a printed copy of the title of a certain book, entitled 'The Boston Directory,' containing the city record, a directory of the citizens' business directory and street directory, with map No. XCIX, for the year commencing July 1, 1903, in order to copyright the same, and claimed said copyright as authors and proprietors, and that they deposited in like manner the sum of fifty cents for copyright fees, and that thereupon, on the 11th day of July, 1903, and also before the date of publication in this or any foreign country, deposited in the mails within the United States, addressed to the librarian of Congress, at Washington, District of Columbia, two printed copies of such copyright directory, and that the said title so deposited was duly recorded by the librarian of Congress upon the said 29th day of June, 1903, whereby they became entitled to the copyright upon said book under the laws of the United States.

"(2) That on the 1st day of October, 1903, the said firm of Sampson, Murdock & Co., for a valuable consideration, and by an instrument in writing, a copy of which is hereto annexed, conveyed the said copyright to the complainant herein, and that the complainant by the said conveyance became and has ever since been and now is the sole owner of said copyright, and of the exclusive rights thereby conferred under the laws of the United States.

"(3) That the two copies of the said book deposited as above set forth were printed from type set within the limits of the United States, or from plates made therefrom.

"(4) That the said Sampson, Murdock & Co. and the complainant, as their assignee and successor in the business, have given notice of the said copyright by inserting in the several copies of every edition published on the title page thereof the copyright notice required by law, in the following words, to wit: 'Copyright 1903, by Sampson, Murdock & Co.'

"(5) That the defendant corporation, after the recording of the title of the said book, and the depositing of two copies thereof as provided by the laws of the United States, and within the term of copyright limited, and without the consent of the proprietors of the said copyright, in writing or otherwise, has printed, and is about to publish and sell, or expose for sale, many copies of a certain book entitled 'The 1904 City Directory of Boston,' each of which said copies is in whole or in part a copy of the directory compiled and copyrighted by the said Sampson, Murdock & Co.

"(6) That such copying and threatening to publish and sell the same is in violation of the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing, and vending the book duly copyrighted to the said Sampson, Murdock & Co., the copyright of which has been assigned by them, and is now held by your orator as aforesaid."

The master's report is as follows:

"The report of proceedings before me filed in court on March 7, 1904, is referred to as part of this report. The ruling and order made by me March 3, 1904, as in said report of proceedings appears, having been sustained by the court on March 7, 1904, the hearing before me under the order of court entered March 3, 1904, was continued on March 9, 1904, and on subsequent days thereafter by adjournment. The defendant produced before me the original copy for its proposed directory, according to my said order. It also produced a bound copy of its said proposed directory. Both were submitted to the examination of the complainant. Having now fully heard the parties and their evidence and the arguments of their counsel, according to the order of court of March 3, 1904, I hereby report thereon as below.

"My findings of fact are as follows:

"(1) The allegations of articles 1–4, inclusive, of the complainant's bill, regarding the issuance to it of the copyright upon the book there referred to, the validity of that copyright, and the complainant's title thereto, are established. The evidence in support of them was not contradicted before me by the defendant. A copy of the complainant's copyrighted directory was in evidence before me, and is to be referred to in connection herewith.

"(2) The defendant corporation, organized for that purpose in August, 1903, under the laws of Massachusetts, has prepared and printed, and, without the consent of the complainant, is about to publish and sell, or offer for sale, a

book entitled as stated in article 5 of the complainant's bill; being the book, a copy whereof was produced by the defendant before me, as stated above.

"(3) The defendant's book referred to in the preceding paragraph differs from the complainant's book in shape, size, style of binding, and typography; also in arrangement, in so far as it has three columns upon each page, instead of two. These differences are such as to prevent it from being confused with or mistaken for the complainant's book. They readily appear by inspection of the two books produced. The title of the defendant's book differs from that of the complainant's book.

"(4) The general directory comprised in the defendant's book contains about 50,000 more names than the corresponding division of the complainant's book. The former contains about 318,000, the latter about 268,000, names. Whenever a person mentioned in this part of the complainant's book has a telephone, the fact is stated, which is information not given in the complainant's book. The business directory comprised in the defendant's book is to a large extent arranged under different headings from those used in the corresponding division of the complainant's book. The street directory in the defendant's book contains several hundred more names than the street directory of the complainant's book, and contains also much additional information with reference to the streets. No claim of infringement was made as occurring in the street directory.

"(5) The defendant began its canvass for names and information to be included in its directory on July 7, 1903. This canvass extended over a period of between four and six months. There were employed in making this canvass 75 men, in all, for various lengths of time. The number of days' work expended on it was more than 2,000. Besides the information obtained by canvassers, circulars and return postal cards requesting information were sent out to many societies, associations, and organizations of various kinds. Schedules of employés were also obtained from public departments and employers of large numbers of persons, such as the Jordan Marsh Company and the New England Telegraph & Telephone Company. The original circulars and some of the original schedules used as above were produced before me.

"(6) The results of the canvass described in the preceding paragraph were compared by the defendant's employés with the complainant's general directory, which was divided into sections called 'checkbooks' for the purpose. The names reported by the defendant's canvassers as obtained by them were checked off in black pencil upon the pages of these checkbooks. Of the names in the checkbooks then remaining unchecked, those considered of sufficient importance to be included in the defendant's book were marked with blue-pencil dots. The names thus 'blue-dotted' were then written out, each on a slip of paper, as it appeared in the complainant's book, with the information there given; and these slips, sorted by streets and districts, were given to canvassers, with instructions to go to the places indicated, make inquiries, and obtain the information required for a directory regarding the names indicated; changing the information on the slip when necessary to conform to the information obtained, checking it as correct when found to be correct, and canceling it if the person indicated could not be found. The canvassers employed in this work were five in number, and were selected as the best of the defendant's force of canvassers. No record, however, was kept by the defendant showing which of these five canvassers performed the work of settling any particular question. The slips given to the canvassers were, when returned by them, either checked as correct or changed as above, pasted in their proper alphabetical order among the other slips containing names and information brought in by the original canvassers, upon sheets which form the copy from which the defendant's general directory was printed, and they thus, except perhaps in a few instances, became incorporated into the defendant's book. A similar use was made of the complainant's business directory, except that after checking thereon all names obtained by the defendant's canvassers, and marking for omission certain other names, all the remaining names were copied as above upon slips, with the information given by the complainant as to each, and all but about 25% of them sent out to be verified by canvassers. The 25% not sent out were destroyed. No blue dots were used to indicate the names to be so copied out, as in the case of the

general directory. The process of copying out names and information selected as above from the complainant's directory was referred to by the witnesses as 'drawing questions,' and the process of verifying the information so taken off upon slips was referred to as 'settling questions.'

"(7) It was asserted by the complainant and denied by the defendant that the use made as above of the copyrighted book in compiling the defendant's book was unlawful, even though every one of the questions drawn was properly verified before the information taken in it from the copyrighted book was reproduced by the defendant. This is a question of law upon facts about which there is no dispute, and is dealt with below (page 20, master's report). It was further contended by the complainant and denied by the defendant that, upon the evidence before me, the information taken as above from the copyrighted book had not been properly verified before reproduction in the defendant's book. This is a question of fact, which I next proceed to consider.

"(8) Fictitious Names. For the purpose of enabling it to detect copying, the complainant inserted in its copyrighted book certain fictitious or imaginary names. Three of these names appear in the defendant's book, viz.:

" 'Rogers, Robert L. 312 Maverick.' Copyrighted book, p. 1969, in the business directory, under 'Boots and Shoes.'

" 'Rogers, Robert L. 312 Maverick E. B.' Defendant's book, p. 1774, in the business directory, under 'Shoe Dealers.'

" 'Jones, G. W. 1650 Dorchester Av.' Copyrighted book, p. 2051, in the business directory, under 'Hairdressers.'

" 'Jones, G. W. 1650 Dorchester Av. Dor.' Defendant's book, p. 1613, in the business directory, under 'Barbers.'

"(Neither of the names is in either general directory.)

" 'McKinley Hall, 24 W. Concord.' Copyrighted book, p. 66, under 'Public Offices, Halls, Blocks, &c.'

" 'McKinley Hall, 24 W. Concord St.' Defendant's book, p. 173, under 'Office Buildings, Halls, &c.'

"There were ten such names, in all, in the copyrighted book, three of which were in the street directory. The president of the complainant company, who testified in regard to them, was asked on cross-examination to give the other seven fictitious names, and to state whether or not they also appeared in the defendant's book. He declined to do so, and I ruled that he need not do so unless he chose. To this ruling the defendant excepted. There is no McKinley Hall in Boston, there are no such persons as the fictitious names represent, and there are no such numbers on the streets referred to. The sheets from which the defendant's book was printed show that the matter appearing in the book about Robert L. Rogers and McKinley Hall came in each case from a question on slip checked as if sent out for verification and found correct, and that what appears about G. W. Jones was written upon the sheet, instead of being on a slip. There was testimony tending to show that it was written upon the sheet from a checked slip brought in after the sheets had been made up. Whether no question was ever really drawn, or none ever really sent out to be settled, or none ever really settled, the result is the same, viz., that in these three instances matter from the copyrighted book was transferred to the defendant's book without independent verification.

"(9) Names of Persons Deceased. The copyrighted book was published July 13, 1903. The work of compiling it was therefore substantially completed before the defendant's canvass began, on July 7, 1903 (paragraph 5). There appear in the defendant's book names of persons given by the copyrighted book, but who are shown by the city records to have died either before the defendant's canvass began, or so soon thereafter that no question slips regarding them, drawn from the copyrighted book, could have been checked and returned as correct if the inquiry necessary to a proper settlement had been really made. These are: Suminsby, Rodney F., died June 10, 1903; Fitzgerald, William J., died July 1, 1903; Dexter, George, died May 28, 1903; Murphy, Daniel J., died June 1, 1903; Gerrish, Geo. H., died May 31, 1903; Gearin, Stephen J., died May 27, 1903; Parker, Edward J., died July 3, 1903; Phillips, Charles P., died June 18, 1903; Tully, James, died July 2, 1903; Rosenthal, Joseph, died May 7, 1903. (The widows of two of these persons,

Suminsby and Rosenthal, appear as such in the defendant's book.) In each of these cases, however, the question slip forming part of the copy from which the defendant's book was printed was produced, and found to bear the check indicating that it had been settled as correct. Other instances in which the name of a person deceased before its canvass began appear in the defendant's book are referred to hereafter; the evidence being, as to them, that the slip from which the name was printed was one brought in by an original canvasser, and not one sent out as a question drawn from the copyrighted book to be settled.

"(10) Errors Reproduced. In the following cases errors in the copyrighted book reappear in the defendant's book, although the question slip sent out is found, on the copy sent to the printer, checked as correct.

" 'Abbot, Samuel, engineer, bds. 27 High Shsn.'

" 'Abbott, Samuel, engineer, bds. 27 High Chsn.'

"Both these names are in the general directory of the copyrighted book. The defendant's book repeats the latter name and both addresses as given, although the former name is changed to Samuel S.

" 'Adamson. Thomas W., grocer, 1825 Dorchester Av.' In the business directory this number is 1847. The defendant's general and business directories differ in the same way, though a question was drawn on each, and checked up as correct.

" 'Anderson, Chas. A., salesman, 651 Wash.' This appears in the Gen. Dir., both books. The right name is William C., which both books insert in its proper place, with the residence given as Wakefield. The defendant gives Chas. A.'s residence as Melrose, the copyrighted book giving it at Wakefield.

" 'Austin, George M. & Son.' Copyrighted Gen.

" 'Austin, G. M. & Sons.' Do Bus., 'Provisions.'

"The same discrepancy between Gen. and Bus., under 'Provisions,' occurs in the defendant's book. Defendant's Bus. has also 'Geo. M. and Son' under 'Poultry.'

" 'Ballardville Mills.' So in both books. Gen. Dir. The correct spelling is 'Ballardvale.'

" 'Beane, William M. Mrs. & Co.' Copyrighted Gen.

" 'Beane, W. M. Mrs.' (Do Bus.)

"The same discrepancy between the Gen. and Bus. (under 'Fancy Goods') appears in defendant's book.

" 'Beckwith, Leslie A.' Copyrighted Gen.

"The name so appears in defendant's Gen. The right name is 'Leslie W.' (The defendant also has 'L. W. Beckwith.')

" 'Bullard, George P.'

"Both books (Gen.) give him as president, etc., of 'Eastern Expanding Metal Co.' The correct word is 'Expanded.'

" 'Capen, Walter.' Copyrighted Bus.

"The true name is 'G. Walter,' and is so given in copyrighted Gen. Defendant's Gen. omits the name altogether. Its Bus. gives it without the 'G.'

" 'Enneking, John J. 174 Tremont.' Copyrighted Bus.

"So in defendant's Bus. under 'Artists.' The correct number is 175a. The copyrighted Gen. has the name; the defendant's Gen., not.

" 'Fletcher, Howard F.' Copyrighted Gen.

"Same in defendant's Gen. The right name is 'Howard S. Fielding, John B.'

"Copyrighted Gen. gives the residence as Somerville, whereas it should be Malden. Defendant's Gen. does the same.

" 'Gallivan, Timothy.' Copyrighted Gen.

"Same in defendant's Gen. The right name is 'Galvin,' and this defendant also has.

" 'Gray, Robert B. bds. 81 Arlington.' Copyrighted Gen.

"Same in defendant's Gen. The right number is 8. There is no 81 on the street.

" 'Gibbs, Carrie A.' Copyrighted Gen.

" 'Gibbs, Carrie E.' Do Bus.

"The same discrepancy exists between defendant's Gen. and Bus.

" 'Guild, Willard G.' Gen., both books.

"The right name is 'Willis G.'

" 'Johnson, Adolph O.'

"The copyrighted Bus., under grocers, gives his place of business '498 Summer St.' This, as appears by copyrighted Gen., is his residence, but not his store, which is 487, same street. Defendant's Bus. repeats 498 as his store.

" 'Koritzky, Simon.' Copyrighted Gen.

" 'Kovitzky, Simon.' Do Bus., under 'Grocers.'

"Same discrepancy between defendant's Gen. and Bus. The defendant's Gen. has some information not in copyrighted book.

" 'Levy, Lewis I. & Son.' Copyrighted Gen.

" 'Levy, L. I.' Do Bus., 'Fancy Goods.'

"Same discrepancy between defendant's Gen. and Bus.

" 'Milton Bradley Co.' Copyrighted Gen.

" 'Bradley Milton Co.' Do Bus., 'School Supplies.'

"Same discrepancy between defendant's Gen. and Bus. The first name is the right one.

" 'Morrell, George C. 40 State St.'

"Under lawyers in Bus. of both books. He is not a lawyer, although copyrighted Gen. erroneously describes him as such.

" 'Patten, F. R. Mrs.'

"Her lunchroom is given in Bus. of both books, under 'Restaurants,' as at '2280 Dorchester Av.,' which is wrong according to the Gen. of both books.

" 'Richardson, Earl B.' Copyrighted Gen.

"Same in defendant's Gen. The right name is 'H. Earl,' which both books (Gen.) also have.

" 'Ryan, George T.' Copyrighted Gen.

" 'Ryan, George F.' Do Bus., 'Florists.'

"The same discrepancy is found between defendant's Gen. and Bus.

" 'Trautmann, Louis H., salesman 178 Tremont, rm. 4, bds. 19 Wabeno, Rox.'

" 'Trotman, Louis H., salesman, 178 Tremont, rm. 4.'

"Both these names appear in the copyrighted general directory. They appear in the same manner in the defendant's general directory, except that the defendant spells the first name 'Trautman, Lewis H.'

" 'Wachuset Thread Co.' Copyrighted Gen.

"The name appears in the same way in defendant's Gen. The correct spelling is 'Wachusett.'

" 'Watson, George.'

"Both business directories, under 'Accountants,' give his address as '53 State St., room 705.' The right room is 605, and it so appears in the Gen. of both books.

" 'Weddick, Frank.'

"The Gen. of both books give the surname spelled thus, with the same information, but the defendant has Frank L. instead of Frank. The correct spelling is 'Wedick,' and this the defendant has also; the name spelled with one 'd' appearing to have been obtained on the original canvass, and as 'Frank,' not 'Frank L.'

" 'Wiggin, Henry D., Jr.'

"The Gen. of both books has this name, and both give the residence at Medford. The man left Medford in April, 1903.

"I omit about twenty instances having a similar tendency to show imperfect settling of question slips, but in which there seems to be more possibility that a reasonably careful canvasser might have independently fallen into the error reproduced. As to nearly half of these, also, they are names of nurses, which both parties may, perhaps, have got at secondhand from a list of nurses.

"(11) It will appear from the cases cited on page 20 that if the defendant is permitted at all, by the law of copyright, to reproduce in its own book information based upon the copyrighted book, according to the above-described method of drawing and settling questions, it is only upon condition that it uses the question slips for no other purpose than to direct its canvassers to the sources of information, and there obtains the information reproduced, by its own labor, to the same extent as it would have done without any question slip at all. The defendant employed in superintending the work of preparing its book Mr. George M. Hyde and Mr. Frederick H. Radford, two

persons of large experience in the business of publishing directories; both having been employed for many years by the complainant or its predecessors, and afterwards, in 1902, by a concern called the City Directory Company. While connected with the City Directory Company, Mr. Hyde had consulted counsel regarding the legality of 'drawing questions' from existing copyrighted directories. No counsel were separately consulted upon this point by the defendant with special reference to its canvass. Both Hyde and Radford testified before me (the testimony being objected to by the complainant, and admitted subject to its exception) that they believed they had a perfect right to follow this method of drawing questions described above. I find that they did so believe. The advice from counsel received by Hyde as above was that he had a perfect right to draw off every name and verify it. The fact that Hyde had received such advice was known to Radford and Seaver. The persons who drew the questions for the defendant's directory upon the slips referred to, or many of them, testified before me, as did also all the canvassers who settled them, and many of the persons who afterwards inserted them in the copy from which the defendant's book was printed. The testimony given by all these persons was that, throughout the preparation of the defendant's book, frequent, reiterated, and emphatic instructions were given to all its employés by Mr. Hyde and Mr. Radford, also by Mr. Seaver, the president, to make no use of the copyrighted book except for the purpose of drawing questions from it; also that those instructions were obeyed. It was agreed that all the defendant's employés, if called, would testify to the same effect. (See the stipulation filed before me March 25, 1904.) Defendant employed, in all, between fifty and sixty office assistants, and, including the five canvassers already mentioned, thirty men in all were employed in settling questions, who did, in all, 337 days' work. My conclusion, however, must be, from the facts above found in paragraphs 8, 9, and 10, that the instructions so given were not always obeyed. It is, of course, possible that in some of the instances cited in paragraphs 9 and 10 the canvasser supposed to 'settle' the questions used the slip taken from the copyrighted book only in the manner described at the beginning of this paragraph; that the information thereby obtained by him was wrong, and, in the cases cited under paragraph 10, wrong in the same way that the information taken from the copyrighted book was wrong. It does not seem to be possible that all the instances referred to can be so accounted for. The presumption arising from facts shown, in my opinion, calls upon the defendant to account for each instance by specific proof, and cannot be disposed of by general testimony that the instructions referred to were given and followed. I therefore find that copyrighted information was, upon any view of the law, unlawfully transferred to the defendant's book in all the instances referred to.

"(12) The defendant contended that the evidence before me showed its original canvass to have been made without any use whatever of the copyrighted book, and also to have been such as to correct a very large proportion of the mistakes occurring in that book. I find that in the following instances mistakes occurring in the copyrighted book have been reproduced in the defendant's book, not by means of question slips drawn from the copyrighted book, but by means of slips brought in by the defendant's original canvassers, and made part of the copy from which defendant's book was printed.

" 'Bauer, John W.' This name appears in the general directory of both books. The correct name is 'John N.' The defendant's book gives his residence, which is not in the copyrighted book. The reproduction of the error, however, is not explained.

" 'Dana, Samuel L.' The residence is given in both books (general directory) as '44 Peter Parley Road.' The correct residence is '49.' (The copyrighted book has 'S. L.,' whereas the defendant has 'Samuel,' in the business directory.

" 'Floyd, Ezra B.' The name is so given in the general directory of both books. The correct name is 'Eugene B.' The defendant gives the company whereof Mr. Floyd was treasurer—Glen Almond Mica Mining Company— which the copyrighted book does not.

" 'Langerfeld, John P.' Both books, in their business directories, under 'Bakers,' give his address as '98 Boston.' That address has been wrong since

February, 1903, when he left it. The defendant also gives two other addresses, which the copyrighted book has not.

"'Starbard, Nathaniel W.' The name so appears in the Gen. of both books. The correct spelling is 'Starbird.'

"'Willson, Alexander E.' Both books (Gen.) give his business address as '28 School St. Room 56.' The correct room number is '59.' The defendant gives the middle initial 'W,' in place of 'E.'

"I find also that the following names, also incorporated in the defendant's book by means of original canvassers' slips, are names of persons who had died since the insertion of their names in the copyrighted book, but before the defendant's canvass, viz.: Gensler, William, died July 8, 1903; Leonard, Frank A., died June 22, 1903; Morrison, George G., died July 3, 1903; Ramsay, William H., died May 28, 1903; Scully, Charles H., died June 13, 1903; Sproul, Charles W., died June 17, 1903; Wood, James F., died June 28, 1903. One of the defendant's canvassers testified to having personally canvassed the apartment hotel where Frank A. Leonard last resided, according to the copyrighted book, but not to the specific information he obtained (if any) regarding this name. He did testify that, such information as he got, he got there. Testimony was introduced by the complainant tending to show that Leonard's widow moved away from the hotel before the date of this canvasser's alleged visit. In the other instances the presumption arising is rebutted only by the general testimony of the defendant's employés that they obeyed the instructions given them to make no use of the copyrighted book in their canvass. I find, however, that in the case of William Gensler a sign was found by one of the defendant's canvassers, on March 17, 1904, at the said Gensler's former place of business, reading, 'William Gensler, Hairdresser.' In the case of the name of William H. Ramsay, barber, his name was found upon a doorplate at his address on the same date, but all that was on the door plate was 'W. H. Ramsay.'

"What is said above applies to the name 'Alario Joseph,' which appears in both business directories—under 'Hairdressers' in the copyrighted book, under 'Barbers' in the defendant's. He left the address given July 4, 1903.

"(13) I find, upon the indications afforded by the instances cited in the preceding paragraph, that there has been some copying of names or information contained in the copyrighted book, independently of questions drawn from it or the settlement of such questions. I am unable to find, upon any evidence before me, whether, in the instances above given, the original canvassers, or the persons who transferred their slips to the copy for the printers, or who else, were responsible in these cases. Otherwise than as appears in the instances referred to, I find no evidence of copying independently of drawing questions as explained above (paragraph 6).

"(14) I also find some reason to believe from the indications afforded by the defendant's 'checkbooks' (paragraph 6) that its original canvass was not as full and complete as might have been expected. The total number of copyrighted names checked as not obtained by canvassers has not been counted by either side, and is only to be ascertained by estimate. The president of the defendant company estimated it at one-quarter. Neither has the number of copyrighted names blue-dotted been counted, and this also can only be estimated. The same witness estimated it at one-quarter of the names not obtained by canvassers, which would be 6.25 per cent. of the whole. Mr. Hyde estimated it for the general directory at 22 per page, which would be, in all, 41,162 for the whole number. The estimate on behalf of complainant is 27.2 per page, or 50,891 for the whole. If either of the two latter estimates, which seem to be more likely to approximate the truth than the former, be accepted, the number of copyrighted names not returned by the defendant's original canvassers, which must have been considerably larger still, is not easily accounted for consistently with the theory of a thorough original canvass by the defendant. Other facts leading to the same result are that a large number of prominent and well-known names in the copyrighted general directory and a large proportion of such headings in the copyrighted business directory, as 'Masters in Chancery,' 'Hospitals and Dispensaries,' 'Piano Tuners,' 'Clubs,' 'Artists,' are shown by the checkbooks not to have been obtained by the original canvass. The total number of names in the defend-

ant's general directory being 318,000, as above found (paragraph 4), if Mr. Hyde's estimate of the number of names blue-dotted be deducted, there will be left 276,838, as the number of those obtained by the defendant independently of the use of questions drawn. If the complainant's estimate of the blue-dotted names be deducted, the remainder will be 267,109.

"(15) Not counting the three fictitious names (paragraph 8), there have been indicated above 53 instances which are found to show copying from the copyrighted book. For the purposes of the hearing before me, about 600 cases of error, omission, or discrepancy in the copyrighted book, being about one-fifth of one per cent. of all the defendant's names, were compared on behalf of the complainant with the defendant's book. About 8.8 per cent., therefore, of the entire number compared, are found to be reproduced by the defendant. Thirty-nine of the instances referred to are cases where questions were drawn upon blue-dotted names, or 6.6 per cent. of the whole number examined. If the blue-dotted names be taken as numbering 25 per page, which is 16⅔ per cent. of all the copyrighted names, and if all the questions drawn on blue-dotted names be assumed to show copying in the same proportion as the number examined, the percentage of all the copyrighted names improperly reproduced by blue-dotting would be 1.10 per cent. As above found, however, the process of blue-dotting and drawing questions was not the method of reproducing the copyrighted matter in all the cases where it has been reproduced. In 14 instances (paragraph 12) it must be ascribed to some other part of the work of preparation. The defendant requests the finding that in the case of all the 600 names examined, but not put in evidence by the complainant, errors in the copyrighted book were found not to have been reproduced, or else to have been corrected by the defendant. I find that the defendant corrected the complainant's errors in some of these cases, but I do not think that any further finding regarding such names is warranted by the evidence.

"(16) The complainant has remaining on hand 195 copies of its copyrighted book. The price at which they are regularly sold is $6. It may reasonably expect to sell 75 more copies; one reason why the number is not greater being that it expects, in regular course, to publish a 1904 directory in July. If, therefore, the only damage to the complainant by publication of the defendant's book is the loss of sale of copies of its copyrighted book, such damage will not exceed $450. The damages to the complainant's business, however, which will result from the publication of a rival directory such as the defendant's book, will be much greater, and will be of such a nature that they cannot be estimated at law, and will be in that sense irreparable.

"(17) The defendant has expended, in compiling, printing, and binding its proposed directory, between $35,000 and $40,000. The issue of the injunction prayed for by the complainant will probably result in the total loss of this investment. The advertisements inserted in the book have been inserted under a contract providing for payment when the book is published, and the total amount so paid for advertising is a good many thousand dollars. The book, if published, will be of substantial value.

"(18) The galley proof slip annexed to the third affidavit of Charles D. Marcy, filed in court February 29, 1904, is found not to be a part of the defendant's book as printed. I find, that pages 1617 and 1618, being the pages of the defendant's book whereon the matter appearing on said galley proof slip would have appeared in the book, were, as those pages appeared in the printed proof sheets before me, printed on different type from the remaining proof sheets, and inserted by pasting, in the place of other pages removed, among the proof sheets submitted. I find, however, upon the evidence of the printer who set it up, called as a witness by the complainant, that he was directed by defendant to print no further from the galley proof slip at some time prior to the filing of the bill of complaint. Pages 1617 and 1618, as they appear finally in the defendant's book, omit two of the names referred to in Marcy's affidavit No. 3, and correct the errors pointed out by said affidavit in the four remaining instances.

"(19) Except as set forth in this report, I find no reason to question the good faith or honest intention of any person concerned in the enterprise of preparing the defendant's book.

129 F.—49

"My conclusions of law are as follows:

"(1) The question referred to above in par. 7, viz., 'Is it lawful, in the preparation of a directory, to copy, verify, check, and correct copyrighted information, with intent to reproduce it, save as corrected, in a competing book?' is one which does not appear to be settled by any express and controlling decision. The English cases (Kelly v. Morris, L. R. 1 Eq. 697; Morris v. Ashbee, L. R. 7 Eq. 34; Morris v. Wright, L. R. 5 Ch. 279; Moffatt v. Gill, 86 Law Times R. 465) and the following in the United States (Banks v. Mc-Divitt, 13 Blatchf. 163, Fed. Cas. No. 961; List v. Keller [C. C.] 30 Fed. 772; E. Thompson Co. v. American, etc., Co., 122 Fed. 924, 59 C. C. A. 148, 62 L. R. A. 607; Colliery Co. v. Ewald [C. C.] 126 Fed. 843) seem to be those most closely relating to the point to be decided. It does not appear, therefore, to be a clearly settled question of law. My own opinion (of course, submitted with diffidence, under the circumstances) is that the question should be answered in the negative. My conclusion of law, therefore, is that none of the information incorporated in the defendant's book by means of questions drawn as above, whether settled or not, can be published without violating the complainant's copyright.

"(2) The infringement found is clear in law and substantial in amount, whatever be the decision of the question referred to above under 1.

"The validity of the complainant's copyright and its infringement as above by the defendant's proposed book being established, the complainant is entitled, upon general principles, to have the publication of the book enjoined pending further proceedings, at least as to so much of the work as is a plain infringement, and such injunction is granted in the ordinary course. It is, however, granted or refused in every case according to the discretion of the court. The facts which may be supposed to guide the court in exercising such discretion have been found above."

Alexander P. Browne, for complainant.
Gaston, Snow & Saltonstall and Thomas Hunt, for defendant.

HALE, District Judge (after stating the facts). In this case, after a full hearing of the parties and their witnesses, the master has made an ample, detailed, and complete report, embodying a careful analysis of the testimony. We have copied this report in full, as it, with the bill in equity, constitutes the record; and so we need not recite its details.

The master has found that the damage to the complainant, by publication of the defendant's book, will be, in the loss of the sale of its copyrighted book, a sum not exceeding $450. He finds further that the damages to the complainant's business which will result from the publication of a rival directory, such as the defendant's book, will be much greater, and will be of such a nature that they cannot be estimated at law, and will be in that sense irreparable. He further finds that the defendant has expended in compiling, printing, and binding its proposed directory between $35,000 and $40,000; that the issue of the injunction prayed for by the complainant will probably result in the total loss of this investment; that the advertisements inserted in the book have been inserted under a contract providing for payment when the book is published, and the total amount so paid for advertising is many thousand dollars; that the book, if published, will be of substantial value. He states the leading question of law which arises in the case, namely: Is it lawful, in the preparation of a directory, to copy, verify, check, and correct copyrighted information, with intent to reproduce it, save as corrected, in a competing book? And he says that this question is one which does not appear to be settled by any express and controlling decision. He then refers to the leading English and

American cases, and concludes that, in his opinion, none of the information incorporated in the defendant's book by means of "drawing questions," whether settled or not, can be published without violating the complainant's copyright. He further finds that there has been an infringement, whatever may be the decision on the above question.

Since the presentation of this report, our attention is called to Dun v. International Mercantile Agency (C. C.) 127 Fed. 173, a case just decided, in which Judge Lacombe says:

"It is not disputed that defendant made use of complainant's book in preparing its own publications. Thanks to such use, it discovered the names of individuals, firms, and corporations engaged in business, and therefore desirable for inclusion in its book, which names had apparently not been discovered by the investigations of defendant's own canvassers, nor found in some other publication. The names thus obtained from complainant's book aggregated certainly hundreds, possibly thousands. Was this an unfair use of the complainant's book? Had this question been presented to this court a year ago, the answer might not improbably have been in the affirmative. Such use of another's compilation was approved in Moffatt v. Gill, 86 Law Times Rep. 405, but that decision was not controlling here, and for reasons assigned in Colliery Engineering Co. v. Ewald (C. C., Oct. 9, 1903) 126 Fed. 843, it was thought that its conclusions were harsh and inequitable. Nevertheless, propositions which work hardship to the individual are sometimes sustained on grounds of public policy, and the opinion of the Court of Appeals of this Circuit in Thompson Co. v. American Lawbook Co. (July, 1903) 122 Fed. 922 [59 C. C. A. 148, 62 L. R. A. 607], expressly approves the doctrine of Moffatt v. Gill. In view of that decision, which is, of course, controlling here, injunction cannot be granted upon the undisputed facts."

It will be seen that this case, which is the latest American authority, approves and confirms the doctrine of Moffatt v. Gill, in which the court said:

"You cannot, where another man has compiled a directory, simply take his sheets, and reprint them as your own; but you are entitled, taking the sheets with you, to go and see whether the existing facts concur with the description in the sheets, and, if you do that, you may publish the result as your own."

See, also, Pike v. Nicholas, L. R. 5 Ch. 251, and other cases cited and commented on in Coppinger on Copyrights (3d Ed.) p. 201.

It seems to us that there is strong reason for holding that the publisher of a new directory has a right to take an old directory, and be guided by it to original sources of information, and that if, so guided, he goes to those sources of information and obtains facts, he may publish those facts, even though they consist of names and addresses which are identical with those published by the old directory. But upon this motion for a temporary injunction it is not necessary, nor fitting, for the court to pass upon this question. The master has wisely reported that it is not conclusively settled. We have pointed out also that he has found that there has been infringement, and that the damage to the complainant from the publication of the defendant's work may be, in a sense, irreparable. But these findings, if sustained by the court, do not necessarily lead us to the conclusion that an unlimited interlocutory injunction should be granted. We have pointed out also the finding with reference to the effect upon the defendant if the injunction is granted as prayed for.

It is the business of a court of equity to inquire not only whether serious and irreparable damage is to be done to the complainant if the tem-

porary injunction is refused, but also to inquire whether or not the injury done to the defendant by the granting of an injunction will be disproportionate to the benefit derived by the complainant. In Hanson v. Jaccard Jewelry Co. (C. C.) 32 Fed. 202, the court said:

"On an application for an injunction pending suit, it is proper for the court to consider the harm that would be done to the complainant by refusing such an order, in comparison with the damage that might be sustained by the defendant in consequence of granting the same."

In Trow Directory, etc., Co. v. Boyd (C. C.) 97 Fed. 586, Judge Lacombe said:

"Nevertheless an injunction to the full extent prayed for by the complainant would, if issued now, be practically a judgment in advance of trial, which would work irreparable injury to the defendant, while it seems as if the complainant might be sufficiently protected by a bond and an account of sales."

In West Publishing Co. v. Lawyers' Co-op. Pub. Co. (C. C.) 53 Fed. 265, Judge Coxe said:

"It is the duty of the court in all these cases to take into consideration the situation of both parties, and not to issue the writ except in the plainest cases, where the result will be irreparable injury to defendant, without corresponding advantage to plaintiff."

In Sargent v. Seagrave, 2 Curt. 553, Fed. Cas. No. 12,365, Judge Curtis said:

"The court looks to the particular circumstances to see what degree of inconvenience would be occasioned to one party or the other by granting or withholding the injunction."

In Spottswoode v. Clarke, 2 Phil. Ch. 157, the chancellor said:

"Here is a publication which, if not issued this month, will lose a great part of its sale for the ensuing year. If you restrain the party from selling immediately, you probably make it impossible for him to sell at all. You take property out of his pocket and give it to nobody. In such a case, if the plaintiff is right, the court has some means, at least, of indemnifying him by making defendant keep an account, whereas, if the defendant be right, and he is restrained, it is utterly impossible to give him compensation for the loss he will have sustained. And the effect of the order in that event will be to commit a great and irremediable injury."

Dron on Copyright, p. 516, says:

"The question of granting a preliminary injunction is affected by many considerations. It depends chiefly on the extent of the doubt as to the validity of the copyright, and whether it has been infringed, the damage which will be sustained by the plaintiff if the injunction is withheld, and the injury that will be done to the defendant if it is granted. The court will exercise its discretion in following that course which appears most conducive to justice to both parties."

See, also, Coppinger on Copyright (3d Ed.) p. 269.

In Ladd v. Oxnard (C. C.) 75 Fed. 703, Judge Putnam, in this circuit, has fully considered the subject which is now before us. At page 732 he considers the question of what loss is "irreparable," within the meaning of the law. He cites Parker v. Woolen Co., 2 Black, 545, 17 L. Ed. 333, where the word "irreparable" is held to cover cases "where the loss of health, the loss of trade, the destruction of the means of subsistence, or the ruin of the property must ensue." In the case last cited,

Mr. Justice Swayne, for the Supreme Court, gives further definition of the meaning of the court in the use of the word "irreparable," and quotes the old doctrine that the case must be "one of strong and imperious necessity." In the matter which Judge Putnam had before him in Ladd v. Oxnard, he found that a large proportion of the copyrighted book was plagarized, and that the plaintiff had made out a very strong and striking case; that it did not appear that the defendants had acted in good faith; and that it did appear that an injunction would destroy property of the defendant of very great value. In the case before us the findings of the master in respect to these matters to which we have just referred are much stronger for the defendant than the facts in Ladd v. Oxnard. In both cases there is evidence of infringement consisting of repetition of errors, and in both cases there is no great similarity of books, or danger that the public will mistake one for the other. Ladd v. Oxnard contains the settled and conservative doctrine of this circuit with reference to the granting of interlocutory decrees in copyright cases. At page 733, Judge Putnam says:

"But the law vests in no other individual holding an official position, whether executive, legislative, or judicial, a power more extensive and more capable of evil, as well as of good, without defined rules either as to the law or the facts, than that which a single judge is so often asked to exercise in the manner asked in the case at bar. In view of this fact, and further in view of the varying and inconsistent expressions in relation to the proper occasions for exercising this power, the only true safety is in saying that a temporary injunction ought never to be granted in a case of new impression, like this at bar, if it be possible to effectuate justice in any other way. * * * The case fails to impress the court with the necessity of granting the complainants, for their protection, an unconditional interlocutory order. The respondent is not charged with attempting in any way to pass off his publication for that of the complainants. Indeed, not only the title page and the short name given the respondent's book, but also its size and style of binding, prevent any probability of one being mistaken for the other. There is therefore no threatened injury to come from a counterfeiting of that character, so that we can apply the fact, which is matter of common knowledge, that publications of this peculiar character rely for their acceptance on the reputation of the compilers and publishers, and the circulation of them must ordinarily be the same, whether protected by copyright or not. The court must therefore presume that, while the respondent's publication might obtain some circulation for which he may be liable to account to the complainants in the way of profits, yet such circulation would probably be in addition to any which the complainants would secure, even if they maintained a monopoly, and consequently not of such character as to cause them a substantial loss of trade."

In the case at bar we are governed largely by the considerations which prevailed in this circuit in the case which we have just cited. It is the duty of the court to take a course most conducive to justice to both parties to the controversy. In this attempt we grant a conditional order, which we think will best subserve the ends of justice. It is ordered that there will be an interlocutory decree for an injunction as prayed for, unless the defendant on or before the 10th day of May, 1904, file a bond to the complainant, with sureties approved by the clerk, in the penal sum of $5,000, conditioned for the payment of any sum, except costs, which may be finally decreed against the defendant in this court or on appeal, and keep an account of sales of directories made by it